USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/30/2014_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN DUDLEY,

                Plaintiff,

      v.

NEW YORK CITY HOUSING
AUTHORITY, YEHUDA GELBFISH,
KRYSZTOF ORLOWSKI, and BOB
MARANO, individually and in their official
capacity,

                Defendants.

**MEMORANDUM
OPINION & ORDER**

12 Civ. 2771 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Brian Dudley alleges that his former employer,[1] Defendant New York City Housing Authority ("NYCHA") and three of his supervisors – Defendants Yehuda Gelbfish, Krysztof Orlowski, and Bob Marano – discriminated against him on the basis of his race and retaliated against him for opposing unlawful employment discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.  (Cmplt. (Dkt. No. 1))  He further claims that Defendants discriminated against him on the basis of certain physical disabilities, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the NYSHRL, and the NYCHRL.  Dudley also alleges that Defendants violated his right to equal

---

[1] Dudley states that his employment with NYCHA was terminated after the close of discovery in this action and during the briefing of this motion.  (See Pltf. Br. (Dkt. No. 31) at 11 n.2)  He is currently pursuing hostile work environment, retaliation, discrimination, and wrongful termination claims against NYCHA in a related action before this Court, which addresses events that occurred after January 17, 2012.  See Dudley v. N.Y.C. Hous. Auth., 14 Civ. 5116 (PGG) (S.D.N.Y.) (Dkt. No. 2).

protection – based on both his race and his disability – under 42 U.S.C. § 1983.  Defendant has

moved for summary judgment on all claims.  (Dkt. No. 22)  For the reasons stated below,

Defendant's motion will be granted.

## BACKGROUND[2]

### I.    THE PARTIES

Dudley – who is a black male – was hired by the NYCHA in 2000 as a Level III

Computer Associate in the Systems and Computer Services Department.  (Pltf. R. 56.1 Stmt.

(Dkt. No. 34) ¶ 1)  In 2005, Dudley was promoted to the position of Software Computer

Specialist.  (Id. ¶ 2)  A Computer Specialist's responsibilities include the design,

implementation, enhancement, maintenance and analysis of software systems.  (Id. ¶ 3)

Computer Specialists at NYCHA are given tasks at four assignment levels (I-IV), each with

varying degrees of difficulty and latitude for independent work.  (Nov. 4, 2013 Niederhoffer

Decl. (Dkt. No. 23), Ex. 7; see Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 3; Pltf. R. 56.1 Stmt. (Dkt. No.

34) ¶ 3)  Dudley was a Level I Computer Specialist.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 2)  As a

Computer Specialist, Dudley was assigned to the Client-Server Division of NYCHA's Business

Solutions Technology Department (the "BST").  (See Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 4; Pltf.

R. 56.1 Stmt. (Dkt. No. 34) ¶ 4; see also Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1

(June 13, 2013 Dudley Dep. Tr.) at 16)

Defendant Yehuda Gelbfish is a Computer Systems Manager at NYCHA.  (Pltf.

R. 56.1 Stmt. (Dkt. No. 34) ¶ 5)  He was hired by NYCHA in 2000.  (Nov. 4, 2013 Niederhoffer

---

[2]  Unless otherwise indicated, this Court cites to facts drawn from a party's Local Rule 56.1
statement where the opposing party has admitted those facts or has not controverted them with
citations to admissible evidence.  See Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir.
2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule
56.1 statement, that fact will be deemed admitted.").

Decl. (Dkt. No. 23), Ex. 3 (Gelbfish Decl.) at 6)  Prior to 2009, Gelbfish was one of Dudley's colleagues in the Client-Server Division of BST.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 5, 6)  In May 2009, Gelbfish was promoted and became Dudley's immediate supervisor.  (Id. ¶ 7)

In addition to Dudley, Gelbfish supervised one other individual, Nina Winer, a white woman who served as an administrative staff analyst.  (Id. ¶ 8)  The parties dispute whether Winer's job responsibilities involved any technical computer work.  (See Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 8; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 8; see Dudley Aff. (Dkt. No. 33) ¶ 5)  It is undisputed, however, that her performance of her assigned duties was adequate.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 8; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 8)

Krzysztof Orlowski is an Assistant Director of Field Services in the BST.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 9)  Orlowski has been Gelbfish's immediate supervisor since February 2007.  (Id.)  Orlowski reports to Vincent Papia, who is a Deputy Director of the BST. (Id.)  Prior to Gelbfish, Orlowski was Dudley's direct supervisor. (Id. ¶ 10)

Robert Marano is the Chief Information Officer of NYCHA and has held this position since May 2013.  (Id. ¶ 11)  Marano was hired by NYCHA in 2002 as the Director of the BST.  (Id.)  He was subsequently appointed Vice President of the BST and served in this role for approximately one year before his appointment as CIO. (Id.)  Marano was not one of Dudley's direct supervisors. (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 12; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 12)  The parties dispute the extent to which he was involved in evaluating Dudley's work performance.  Defendants claim that Marano did not play any role in reviewing or assessing Dudley's work.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 12)  Dudley claims that Marano reviewed Dudley's weekly status report and also was responsible for approving Dudley's promotions and salary increases.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 12; Dudley Aff. (Dkt. No. 33) ¶ 6)

II.   **PLAINTIFF'S RACE DISCRIMINATION AND RETALITION CLAIMS**

NYCHA has adopted and enforces anti-discrimination employment policies and procedures.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 95)  Although Dudley acknowledges that such policies exist, he maintains that Defendants – as to him – have not complied with these policies.  (Id.)  Indeed, Dudley claims that Defendants have discriminated against him on the basis of his race and retaliated against him for opposing discriminatory practices on various occasions since 2009.

A.   **Rita Kuperman's Discrimination Complaint Against Orlowski**

Dudley claims that Defendants have retaliated against him because of his support for a co-worker, Rita Kuperman.  (Cmplt. (Dkt. No. 1) ¶ 21)  Kuperman is a white female and a former Computer Specialist at NYCHA.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at 74)  During her employment, Kuperman worked under the direct supervision of Orlowski.  (See id.; Feb. 4, 2014 Orlowski Decl. (Dkt. No. 29) ¶¶ 2-3)

In January 2009, Kuperman filed a discrimination claim against Orlowski with NYCHA's Department of Equal Opportunity ("DEO").[3]  (See Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 13; Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at 73-76)  The DEO is an internal NYCHA department.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at 73)

On January 27, 2009, Dudley was interviewed by a DEO investigator in connection with the Kuperman complaint.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 13)  Dudley remembers being asked "something about a letter which was written, but that's all [he] can recall now."  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at

---

[3]  Dudley cannot recall the grounds for Kuperman's discrimination complaint.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at 73)

75) The interview lasted a little over ten minutes. (Id. at 75-76) Although Dudley claims that he "testified" on Kuperman's behalf, it is not clear what this testimony was or in what venue it took place. (See id. at 74-76) He did not testify at a hearing. (Id. at 74)

Another employee who was and continues to be supervised by Orlowski – Jimmy Xie – also "gave testimony" in connection with the investigation. (See id. at 76; Feb. 4, 2014 Orlowski Decl. (Dkt. No. 29) ¶ 3) Dudley does not know the content of Xie's testimony. (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at 76) According to Dudley, Winer told him that she gave testimony in connection with the Kuperman investigation as well. (Id., Ex. 2 (June 14, 2013 Dudley Dep. Tr.) at 216)

According to Dudley, "several subordinates under . . . Orlowski . . . [who] testified for Rita Kuperman" were supervised differently after their participation in the investigation, so that they were now only "indirectly reporting to Orlowski." (Id., Ex. 2 (June 14, 2013 Dudley Dep. Tr.) at 216) Dudley believes that this is why Gelbfish became his and Winer's supervisor. (Id.) Orlowski states, however, that Kuperman remained under his direct supervision until she retired in early 2012, and Xie remained – and still is – under Orlowksi's direct supervision as well. (Feb. 4, 2014 Orlowski Decl. (Dkt. No. 29) ¶ 3) Orlowski believes that Dudley and Winer were placed under Gelbfish's supervision because they were performing work that Gelbfish was familiar with. (Id. ¶ 4)

### B.   Orlowski's Denial of Dudley's Transfer Request

In a June 4, 2009 email – more than four months after he was interviewed by the Equal Opportunity investigator – Dudley requested that Orlowski transfer him from the Client-Server Division to another work group – the "Intranet Group," which was supervised by Doug

5

Heyward.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 14; <u>see</u> Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 10)  In that email, Dudley states:

> Chris[,]
>
> We need to have a discussion concerning the [f]lexiblity of completing the [leave of absence ("LOA") requests for personal time].
> Yehuda wants the LOA to be completed 1 hour after my arrival, however, often he is not present (like today).  In the past, Chris, you allowed within a 2 day time frame [ ] to complete the LOA.  To me this is more acceptable.
>
> Chris, please have a discussion with Yehuda about his management practices.  We already have had major iss[]ues in communicating about certain tasks.
>
> I am requesting a Transfer to Doug Heywood's (Intranet group).  I feel this is a better skill set match moving forward since NYCHA's depa[rt]ments will be revised shortly.  Also, my productivity level will increase due to the skill set match.
>
> Mr. Heywood is still open to this idea of bringing me aboard, immediate[el]y.
>
> Thanks.
>
> B. Dudley

(Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 10)  Orlowski denied Dudley's transfer request.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 14)  Orlowski also forwarded this email to Gelbfish. (<u>See</u> Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 10)

It is undisputed that Orlowski's decision to deny the transfer was motivated, at least in part, by his belief that Dudley's skills and work experience were best suited for the Client-Server Division, where he had been working for a number of years.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 14)  It is likewise undisputed that Orlowski believed that Dudley's transfer would cause him to "lose the [specialist] line" or his budget.[4]  (<u>Id.</u>; Nov. 4, 2013 Niederhoffer

---

[4] The record does not indicate what the "specialist line" is.

Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at 82, Ex. 48 (Oct. 31, 2013

Orlowski Decl.) ¶ 5)

   Dudley claims that – in addition to these concerns – Orlowski also denied the

transfer request in order to retaliate against Dudley for his role in the Kuperman investigation.

(Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 14)  Orlowski maintains that he was not aware of Dudley's

involvement in the investigation of Kuperman's discrimination claim until February 2011, when

NYCHA received, and began to investigate, Dudley's complaint with the Equal Employment

Opportunity Commission ("EEOC").[5]  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 81; see also Feb. 4,

2014 Orlowski Decl. (Dkt. No. 29) ¶ 3)  Dudley believes that Orlowksi knew about his

involvement in the Kuperman investigation prior to June 2009, based on the fact that (1) after the

interview, Dudley was instructed to report to Gelbfish; (2) Orlowski seemed "very angry at Rita

Kuperman and the ones who testified"; (3) Orlowski denied Dudley's transfer request; and (4) on

one occasion the employees who testified for Kuperman were asked to volunteer for a "secret

assignment" without being given any details.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23),

Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at 79-80)

  C. **Plaintiff's Regulated Lunch Period**

   On June 8, 2009, Gelbfish sent the following email to Dudley:

This email is to confirm our conversation today regarding HR rules and
regulations and advise you of some others.

**Re: Flex time**

As a general rule, as part of your flex time, you have chosen to arrive at work at
approximately 9:45 am.
In the event that you will deviate from that band and wish to begin prior to 9:30
am, you have committed to notify me via email the day beforehand.

---

[5]  As discussed below, Dudley's EEOC complaint involves the claims at issue in this case.

<u>Re: Lunch</u>

As per our conversation, I am requesting that you choose a consistent 1 hour
period between 12-2 when you would like to take your daily lunch break.

I acknowledge your request that your daily lunch time period be fluid so as not to
interfere with your assigned duties.
I have advised you that, currently, you have no assigned duties that would be
impacted by a fixed lunch schedule.
In the event that an assigned task requires a modification to your lunch schedule, I
will surely approve such a request on a case by case basis.

<u>Re: Breaks</u>

On Monday June 1 at 5:30 pm, I followed up in person on the status of your task
as you were drafting a personal email.  You stated that you could not discuss your
work as you were on a break and proceeded to leave your desk.  I advised you that
you are not entitled to a break at that time, as you would be leaving shortly.
I therefore wish to remind you of the following rules:

As IT professionals, we are entitled to a 20 minute break following 2 hours of
consecutive work provided that such breaks don't abut your lunch time or punch
out time.

<u>Re: Schedule</u>

In response to your statement today that, 5:30 is not immediately preceding the
end of your work shift since you routinely work well past 6 pm.

Please note that your 8 hour work schedule must be completed between the hours
of 8am and 6pm.  If on a given day, by 6pm, you have not accumulated 7 work
hours, you must submit a LOA for the remainder and they can not be made up by
working after 6 pm.

(Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 11; <u>see also</u> Def. R. 56.1 Stmt. (Dkt. No. 26)

¶ 15; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 15)  Orlowski was copied on the email.  (<u>See</u> Nov. 4,

2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 11)

        According to Gelbfish, department policy required every employee to choose a

fixed lunch hour.  (<u>Id.</u>, Ex. 3 (Gelbfish Dep. Tr.) at 47-48)  Dudley maintains that his coworkers

were not required to choose a designated lunch time.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 15)

Beginning in December 2009, Orlowski assigned Dudley to NYCHA's Qmatic system project, under the supervision of Andy Lackrajh.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 18)  Lackrajh is a Software Computer Specialist and the administrator of the Qmatic system at NYCHA's office at 250 Broadway in Manhattan.  (Id.)  Qmatic was just one of Dudley's assignments.  (Id. ¶ 20)  Qmatic is a computer software technology used by NYCHA to help manage its customer flow at its Customer Contact Center ("CCC").  (Id. ¶ 19)  Specifically, NYCHA uses Qmatic to provide customers waiting in a line with a ticket number, and to direct customers up to the service booth when their number is called.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 3 (Gelbfish Dep. Tr.) at 49)  Dudley provided support to the Customer Contact Centers that used the Qmatic system.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 21)  According to Dudley, he was required to correct any errors that occurred in the Qmatic program or to fix the system if it crashed.  (Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 102-03)

On March 1, 2010 – nine months after Dudley was initially instructed to choose a fixed lunch period – Dudley sent Gelbfish an email, informing Gelbfish that he had been unable to take a lunch period the week before because one of his coworkers was absent, and Dudley "[didn't] want to be responsible if Qmatic[ ] crash[ed] during [his] lunch period."  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 12)  Dudley asked Gelbfish to "please have a back-up plan [for] when [his coworker] is absent for the day."  (Id.)

Gelfish sent the following response on March 2, 2010:

> You are always both welcome and requested to take lunch during your designated time.
> In the event that you are the only one on call, you should still take your designated lunch and return to your duties as soon as your lunch hour is over and continue to address any outstanding or new issues that have been reported.

9

Under no circumstances are you either requested or authorized (nor have you ever been) to work during your designated lunch hour.

In the event that you ever feel that there is a conflict between a work assignment and you[r] designated lunch[,] you must notify me in advance of your concerns [s]o that they can be addressed and possibly have your lunch hour for that day modified.

However, in the absence of such advance confirmation you are not requested nor authorized to work during your lunch hour.

**I will take this opportunity to reiterate my request that you specify what your preferred designated lunch hour is.**
**You have consistently claimed to be on "lunch break" during various times from 12-2 and thereafter.**

**It is for this reason that I kindly request again[ ] [that] you designate your preferred lunch time so that you can schedule yourself accordingly and I can more efficiently monitor your time.**

**Please let me know of your decision before [close of business] today.**

(Id.; see also Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 17; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 17)

Dudley claims that he had previously advised Gelbfish of his selection for a designated lunch hour.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 17)

Dudley also states that Orlowski told him that it was necessary for Dudley to choose a fixed lunch period, so that the Qmatic program could be monitored at all times, and designating a particular lunch hour was important for "scheduling purposes with other personnel."  (Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 102; see also Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 16 ("the reason given for requiring Dudley to commit to such a lunch schedule was . . . for client service support considerations"))

Dudley argues, however, that he was required to take a fixed lunch hour because of racial discrimination, and in retaliation for the interview and testimony in connection with Kuperman's discrimination complaint.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 16)  He further claims

that non-black co-workers, who had not complained about discrimination, did not have to commit to a specific lunch hour.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 16)  According to Dudley, Lackrajh – the "chief person" on the Qmatic program -- was "never part of the designated [lunch] schedule."  (Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 102-03)

       **D.**    **Plaintiff's "Out-Of-Title" Assignment**

         Dudley also claims that his assignment to work on Qmatic in December 2009 was "out-of-title" work.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 22)  According to Dudley, the assignment – which included repairing computers, as well as working with Microsoft Word documents and other software – was not part of his job responsibilities as a Computer Specialist in Software.  (Dudley Aff. (Dkt. No. 33), Ex. A (June 14, 2013 Dudley Dep. Tr.) at 145-46) Dudley claims that a Computer Specialist in Operations would ordinarily handle such work.  (Id.; see Dudley Aff. (Dkt. No. 33), Ex. D)

         NYCHA maintains that the Qmatic assignment was not out-of-title work for Dudley.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 22)  According to Orlowski, the assignment constituted IT work that was within the realm of Dudley's job responsibilities.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 4 (Orlowski Dep. Tr.) at 23)

       **E.**    **Clock-In Requirements During Brooklyn Assignment**

         In mid-January 2010, Dudley was instructed to report to NYCHA's Brooklyn Customer Contact Center for approximately one week.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 23; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 23)  Lackrajh was directed to temporarily report to the Brooklyn location as well, although Dudley later remained at the site for a longer period than him.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 24)

Dudley believed that he was required to clock-in each day at NYCHA's Manhattan office located at 250 Broadway, New York, New York, before reporting to the Brooklyn location. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 23)  Dudley claims that because he was not "assigned" to the Brooklyn location – but instead just directed to report to the site – he was required under NYCHA protocols to report to the Manhattan location first. (Id.; Dudley Aff. (Dkt. No. 33) ¶ 9)  Dudley also claims that Gelbfish had directed him previously not to log into any site other than the Manhattan location. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 23; Dudley Aff. (Dkt. No. 33) ¶ 9)

On January 13, 2010, after several days working at the Brooklyn site, Dudley received an email from Gelbfish, inquiring why Dudley had "not punched in at all this week" and noting that "[t]here is a clock available at your location." (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 14)  Dudley responded that he had been told "not [to] log into any other site except 250 Broadway." (Id.)  In a January 13, 2010 email, Gelbfish responded as follows:

> Correct. Unless you are authorized to be at an alternate location at punch in/out, you are not allowed to punch in at any place other tha[n] your assigned location.
>
> There was a time when you were consistently punching in an[d] out of 90 [C]hurch St. while you were not assigned to be there.
> HR asked me to advise you that this is contrary to NYCHA policy and is subject to disciplinary action.
>
> That same policy mandates that if you **are** assigned to be at an alternate location you **MUST** PUNCH IN THERE and should not be using alternate time sheets.

(Id.)

The following day – January 14, 2010 – Gelbfish sent another email to Dudley:

> Brian,
>
> You stated below that you thought you were supposed to use alternate time sheets and not punch in at Brooklyn.

> In response, I clarified that when "you are assigned to be at an alternate location you **MUST PUNCH IN THERE**."
> My email below was pretty clear that you should be punching it at your assigned location, which is Brooklyn (as per your request in the email attached below.)
>
> In addition to my email below, we reviewed the contents of HR memo 45-09, distributed in August of 09, which states that you are expected to sign in and out of you home location. That memo also clearly specifies that your home location is the location where you are expected to start and end your work day.
>
> Last evening you traveled from Brooklyn to 250 Broadway to punch out and this morning you punched in at 250 Broadway on your way to your assigned location in Brooklyn.
>
> Even though 250 Broadway may be on your way to and from your residence, you can not punch in until you reach your assigned location which is currently Brooklyn and must punch out as soon as you leave your Brooklyn location.

(Id. (emphasis in original); see also id., Ex. 1 (Jan. 13, 2013 Dudley Dep. Tr.) at 87)

Defendants argue that Dudley had been directed to report to the Brooklyn site to clock-in, and not to first report to the Manhattan site. (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 23) According to Orlowski, when employees are assigned work at an off-site location for an entire day, they are required by NYCHA policy to clock-in at that location, as opposed to the Manhattan office. (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 4 (Orlowski Dep. Tr.) at 24; id., Ex. 14)

Dudley claims that Defendants discriminated against him on the basis of race by requiring him to clock-in at the Brooklyn site. (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Depo) at 87-88) He argues that he was the only employee required to clock-in for an off-site assignment, and notes that Lackrajh – who is Indian – was not required to clock-in at the Brooklyn site. (Id. at 88; see Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 104) Dudley acknowledges, however, that Gelbfish was only required to

13

oversee where Dudley clocked in and out; Gelbfish did not supervise Lackrajh.  (Dudley Aff. (Dkt. No. 33), Ex. A (June 14, 2013 Dudley Dep. Tr.) at 89)

Dudley alleges that "as many as 10-14 other IT workers . . . performed the same process of reporting to headquarters prior to going to Brooklyn [as he did]."  (Dudley Aff. (Dkt. No. 33) ¶ 9)  Dudley has not offered evidence as to who these workers were, what programs they were assigned to, when they were assigned, who their supervisors were, or what races they are.

According to Dudley, he complained to NYCHA's DEO about this incident, and later submitted a written complaint.  (Id., Ex. A (June 13, 2013 Dudley Dep. Tr.) at 89-90)  Dudley claims that Marano was also informed of his complaint.  (Id. at 89-91)

F.     **Plaintiff's DEO Complaint Against Gelbfish**

On January 27, 2010, Dudley filed a complaint with NYCHA's DEO, claiming that he had been treated unfairly by Gelbfish.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 25)  The complaint related to the clocking-in incidents in Brooklyn.  (Dudley Aff. (Dkt. No. 33), Ex. A (June 14, 2013 Dudley Dep. Tr.) at 89)

In a January 28, 2010 letter, the DEO responded that Dudley had not asserted a cause of action for illegal discrimination under applicable law and, as a result, the DEO did not have jurisdiction to investigate the allegations.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 26; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 26; Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 16)

Orlowski and Gelbfish claim that they were not aware that Dudley had filed the DEO complaint until NYCHA received, and began to investigate, Dudley's EEOC complaint that preceded the instant action.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 81)

G.      **Early Start Time**

On or about February 18, 2010, Orlowski informed Dudley that he would be required to report to work between 8:00 a.m. and 8:30 a.m. beginning the next day, February 19. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 27; Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 17)

Generally, NYCHA requires employees to arrive at work at a "targeted reporting time" between 8:00 a.m. and 10:00 a.m. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 34) The targeted reporting time is determined by the employee's preferences, as well as the needs of the employee's specific work group. (Id.) Employees are expected to arrive within or around this time frame – usually within a 15 minute window – on a consistent basis and then complete eight hours of work. (Id.; see id. ¶ 33; see Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex.18) Under NYCHA's "Flex Time" program, however, an employee is not considered late if – on an infrequent basis – the employee arrives before 10 a.m. and then stays later to make up for the lost time at the end of the day. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 34) An employee who consistently fails to arrive at the specified reporting time – or within the 15-minute grace period – is removed from the Flex Time program and placed on a fixed schedule. (Id.; see Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex.18)

After an employee is removed from the Flex Time program, there is a six-month review period, during which the Human Resources Department reviews the employee's arrival history to determine whether the employee has demonstrated improvement in his or her ability to meet the fixed report time. (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 24), Exs. 23, 24) After a satisfactory review, the employee may be reinstated to the Flex Time program. (Id.)

Prior to receiving Orlowski's email on February 18, 2010, Dudley had a targeted report time of 9:45 a.m., which he had requested and which had been approved by NYCHA. (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 11)

Orlowski claims that he required Dudley to report by 8:15 a.m. in February 2010 because NYCHA needed him to provide support to CCCs using the Qmatic system, which opened daily at 8:00 a.m.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 28)  In his February 18, 2010 email to Dudley, Orlowski states:

> Brian,
>
> Since you are assigned to Q-MATIC support which operates from 8 am to 5 pm with major issues and problems occurring in the morning, beginning tomorrow 2/19/2010 you are on a new working schedule until further notice.  You are required to report to work between 8 am and 8:30 am.  Any arrival after 8:30 am will be marked late or will require approved [leave of absence].

(Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 17)

Dudley claims that Orlowski set the 8:15 a.m. target time in retaliation for his filing the DEO complaint against Gelbfish on January 27, 2010.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 28)  He claims that Lackrajh and Xie – who were also assigned to the Qmatic project – were not required to alter their work schedules.  (Id.)  Dudley has provided no evidence of what their work schedules were, however.

On February 23, 2010, Gelbfish informed NYCHA management that Dudley should be placed "on a fixed schedule of 8:30 to 4:30," "[a]s per" Orlowski's February 18, 2010 email.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 17)

In a March 15, 2010 email, a NYCHA Human Resources manager who had been forwarded Gelbfish's email for a response, informed Gelbfish that

> [a]s a general rule, employees represented by DC37 are removed from flex time for chronically failing to meet their target time.  That is not the case here, since

16

> Mr. Dudley was only told to start reporting at 8:30 on February 18.  If I am
> mistaken. please tell me.
>
> As an alternative to placing him on a fixed schedule, Mr. Dudley should remain
> on flex time **BUT** have his target time changed to 8:15 a.m.  He should also be
> told he has a grace period of 15 minutes before or after 8:15.  This solution should
> satisfy the department's need to have him at work not later than 8:30 a.m.  Going
> forward, if Mr. Dudley fails to meet his target time, then the dep[artment] can
> take steps to remove him from [F]lex [Time].

(Id., Ex. 18)[6]  Accordingly, on March 16, 2010, Orlowski sent Dudley a modified version of the

February 18, 2010 email, which states:

> Since you are assigned to Q-MATIC support which operates from 8 am to 5 pm
> with major issues and problems occurring in the morning, beginning tomorrow
> you should be arriving to work at 8:15 am with [a] grace period of 15 minutes
> before or after 8:15 am.  You will remain on [a] flex time schedule but frequent
> failure to meet your target time may result [in your being placed] on a fix[ed]
> schedule.  This working schedule remains in effect until further notice.

(Id.)

### H.    Knee Surgery

Dudley alleges that on March 4, 2010, he had knee surgery for a torn meniscus.

(See id., Ex. 13; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 29, 91)  He claims that he struggled with his

commute to work after the surgery because he had to use a cane.  (Id.)  He also claims that

meeting the 8:15 a.m. target time "placed an additional hardship" upon him because of commuter

traffic.  (Id.)

According to Dudley, he told Orlowski and Gelbfish that he had a disability and

had difficulty walking.  (Dudley Aff. (Dkt. No. 33), Ex. A (Jan. 13, 2013 Dudley Dep. Tr.) at

106)

---

[6]  The reference to "DC37" is to District Council 37, American Federal of State, County and
Municipal Employees, a labor union.

I.    <u>Removal from Flex Time</u>

On or about June 11, 2010, Orlowski assigned Dudley and Xie to the Queens CCC to provide Qmatic support for the June 16 to June 22, 2010 period.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 31)  Dudley was excused from reporting to the site when he had scheduled doctor appointments.  (<u>Id.</u>)

On June 30, 2010, Gelbfish requested that NYCHA's Human Resources ("HR") Department review Dudley's attendance record, and recommended that Dudley be removed from Flex Time for failure to meet his 8:15 a.m. target time on a consistent basis.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 18; Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 33; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 33)  Gelbfish described the following sequence of events as the basis for his request:

> On March 16, Mr. Dudley was advised that:
> - He remained on flex time.
> - His target time was changed to 8:15 a.m.
> - He has a grace period of 15 minutes before or after 8:15.
> - Going forward, if he fails to meet his target time, the dept will take steps to remove him from flex.
>
> On April 28:
> - We reviewed his time and found that in the prior 6 weeks, Mr, Dudley was late 63% of the time (19 out of 30).
>   (March 17, 19, 23, 24, 25, 26, 29, 30, 31, April 13, 14, 15, 16, 21, 22, 23, 26, 27, 28)
> - He was advised that if this tendency continues, he will be placed on fix time permanently.
> - We scheduled another review for three weeks later on May 21.
>
> On May 21:
> - We reviewed his time and found that in the prior 3 weeks he was not late.
>
> On June 11:
> - He was notified that he was assigned to the Queens Walk-In Center on June 21-22

- He was advised to "be there as early as possible especially on Opening Day" and to "Check with Bill Betz what [the] optimal arrival time [is] to get as much experience as possible."

On June 23:
- We reviewed his time and found that in the prior 5 weeks he was late 6 times (June 2, 9, 16, 21, 22, 23.)
- Specifically, on June 21-22, regarding which he had been advised to "be there as early as possible." [H]e arrived at 9:42 and 9:51 respectively.
- When confronted regarding his late arrival on June 21-22, he responded via email[,] "The opening of these sites (Bronx, Brooklyn, Queens) in the morning, we normally have coffee, tea, and pastries until 11 am."
- He also cited an email (referenced above, 2nd bullet of June 11) stating "Chris gave me the option with Bill Betz of the start time at this site."
- I followed up with Bill Betz and he confirmed that Brian was never in touch with him regarding a reporting time.
- Bill Betz further stated that he advised ALL his staff working on the project to be there as early as possible, preferably bet·8-8:30 am but under no circumstances later than 9am.
- I overheard Andy Lackrajh specifically advise Brian to report at 8:30 or earlier on June 21-22 due to the important nature of his assignment and the project.

(Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 18)

       Dudley alleges that Gelbfish's request to remove him from the Flex Time program was motivated by racial discrimination and retaliation for Dudley's DEO complaint against him six months earlier. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 33, 35; Dudley Aff. (Dkt. No. 33) ¶ 10) Plaintiff contends that other non-black employees – including Lackrajh -- and employees who had not filed claims of discrimination were not removed from the Flex Time program. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 33, 35; <u>see</u> Dudley Aff. (Dkt. No. 33), ¶ 10)

       In a November 18, 2010 email to Dudley, Gelbfarb described continued instances of lateness:

       Since May your timeliness has continued to deteriorate[:]

- In June you were late 6 times (June 2, 9, 16, 21, 22, 23.)
- In July you were late 4 times (July 1, 22, 29, 30)
- In August you were late 4 times (August 4, 5, 12, 26)
- In September you were late 5 times (September 7, 8, 9, 16, 17)
- In October you were late 10 time (October 5, 7, 8, 13, 14, 21, 22, 25, 27, 28)
- This month so far you were late 7 times (November 1, 3, 4, 5, 9, 12, 18)

(Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 18)

On December 23, 2010 – eleven months after Dudley filed the DEO complaint – NYCHA's HR Department approved the removal of Dudley from the Flex Time program.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 35)  On December 23, 2010, Gelbfish informed Dudley that he had been removed from the Flex Time program, effective January 3, 2011.  (Id. ¶ 36)  Dudley was then placed on a fixed schedule.  (Id.)

In September 2011 – after a six-month review period – NYCHA's HR Department denied Dudley's request for reinstatement to the Flex Time program.  (Id. ¶ 37)  The decision was based on a review of his arrival times and work attendance over the past nine months.  (Id.)  Dudley maintains that the decision not to reinstate him to Flex Time was influenced at least in part by Gelbfish.  (Id.)

Dudley asserts that – based on his attendance record – he should have been reinstated to Flex Time.  (Id.)  He contends that during the relevant period, he was late on only nine days, which amounted to 21 minutes of late time.  (Id.)  Plaintiff contends that, according to an agreement between NYCHA and the DC 37, employees are allowed to accumulate 35 late days per year before any penalty is imposed.  (Id.; see Dudley Aff. (Dkt. No. 33), Ex. E at 5)

**J.      Other Conflicts with Gelbfish**

On December 7, 2010, Gelbfish approached Dudley at his cubicle to talk to him about some work-related matters.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 38; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 38; Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (Jan. 13, 2013 Dudley

Dep. Tr.) at 29, Ex. 3 (Gelbfish Dep. Tr.) at 53-56)  According to Dudley, he told Gelbfish that

he had already clocked out, so they should discuss the matter the next day.  (Nov. 4, 2013

Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (Jan. 13, 2013 Dudley Dep. Tr.) at 29)  When Gelbfish

told Dudley not to go anywhere, Dudley responded, "[A]re you going to give me overtime?"

(Id.)  After Gelbfish responded in the negative, Dudley walked toward the elevator to leave.  (Id.)

Gelbfish followed him.  (Id.; Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 38; Pltf. R. 56.1 Stmt. (Dkt. No.

34) ¶ 38)  The two "had a heated discussion at the elevator."  (Nov. 4, 2013 Niederhoffer Decl.

(Dkt. No. 23), Ex. 1 (Jan. 13, 2013 Dudley Dep. Tr.) at 29)  Dudley claims that Gelbfish

"stalked" him to the elevator.  (Id. at 28)

Dudley filed an incident report with NYCHA's Office of Security ("OFS") dated

December 9, 2010.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 39; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 39;

Dudley Aff. (Dkt. No. 33), Ex. F)  After reviewing video surveillance footage, NYCHA Security

concluded there had been no physical contact between Dudley and Gelbfish.  (Pltf. R. 56.1 Stmt.

(Dkt. No. 34) ¶ 40; see also Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 21)  There is no

indication in the record that further action was taken in connection with this incident.

In a January 6, 2011 email – with the subject line "RE: Hostile Work

Environment" – Dudley reported another incident involving Gelbfish to Marano.  Dudley wrote:

> Yesterday around 3:50 pm, Mr. Gelbfish confronted me near my cubicle (10
> minutes before clock-out time) repeating the same questions about the same topic
> – even when answered numerous times – creating another hostile work episode.
>
> Based on this incident, and the other incident which occurred on Dec[ember] 7th,
> I am requesting an immediate separation from Mr. Gelbfish on a day to day basis.
>
> Each day, I fear for my safety & health.

(Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 24), Ex. 26; see also Pltf. R. 56.1 Stmt. (Dkt. No. 34)
¶ 41)

In a March 16, 2011 email – with the subject line "RE: time sheets unsigned because I am being discriminated against" – Dudley complained to Marano that Gelbfish had not approved a leave of absence request.  (See Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 47; Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 24), Ex 27)  Gelbfish had written on the request that it was not approved because Dudley had not completed two assignments.  (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex 27)  Dudley did not dispute that he had not completed the two assignments, but he claimed that he had been working on two other "critical" assignments instead.  (Id.)  In the email, Dudley claims that "the true reason [Gelbfish] didn't approve [his] time sheets [is because] [Gelbfish] [is] retaliating against [him]."  (Id.)  According to Dudley, Gelbfish had previously sent Dudley an email requesting "personal data" from him.  (Id.)  Three minutes after Dudley responded to Gelbfish's email, he was called into Gelbfish's office and told that his leave of absence request would not be approved.  (Id.)

Dudley also claims that – on a number of occasions – Gelbfish raised his voice to Dudley, "belittled" him, and called his personal cellphone after work hours.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 42; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 42; Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 1 (June 13, 2013 Dudley Dep. Tr.) at 27)

### K.   "Racist" Comments

Dudley alleges that – at some unspecified time between 2009 and 2012 – another Computer Specialist, Mitch Goldberg, told Dudley that Orlowski – who is white – had used a racial slur with respect to Dudley's race.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 42; Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 37-41)  Dudley does not know what Orlowski said or when the comment was made, nor is Dudley aware of any other instances in which Orlowski made racial comments.  (See Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013

Dudley Dep. Tr.) at 37-41)  When asked at his deposition what adverse actions Orlowski allegedly had taken against him because of his race, Dudley responded that he could not "recall" what the acts were.  (Id. at 41)

Dudley alleges that Marano – who is also a white male – made derogatory comments about Dudley's race to Sonia Guidry, another NYCHA employee.  (Id. at 45) According to Dudley, Marano told Guidry sometime prior to 2006 that Dudley is lazy.  (Id.) Dudley claims that calling him lazy is a racial comment because it has "[a] negative connotation of black men who don't want to do anything."  (Id. at 46)

Dudley claims that Marano discriminated against him by denying his request for a transfer from Gelbfish's supervision to Guidry's.  (Id.)  According to Dudley, a black co-worker – Doug Heyward – "had similar problems" obtaining a transfer to another group because Marano "had a problem with African Americans."  (Id. at 49-51)  Marano states that the request was denied because Dudley's skills were best suited for the projects he was working on under Gelbfish and Orlowski.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 47 (Marano Decl.) ¶ 5)

Dudley acknowledges that Gelbfish never made any racially derogatory statements about him.  (Dudley Aff. (Dkt. No. 33), Ex. A (June 14, 2013 Dudley Dep. Tr.) at 225-26)

### L.     Doctor's Notes for Unanticipated Leaves of Absence

Beginning in June 2010, Gelbfish required Dudley to submit doctor's notes as proof of sick leave.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 45; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 45)  In July 2010, Gelbfish required Dudley to submit such notes on official letterhead from the healthcare provider.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 46)

According to Defendants, as a general matter, all NYCHA employees are required to submit doctor's notes to explain absences.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 44)

Gelbfish did not require Nina Winer to submit doctor's notes, however.  (Id. ¶ 54; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 54)  Gelbfish claims that he did not do so because there were never any problem with her arrival time or attendance.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 54)

Gelbfish claims that he required Dudley to submit doctor's notes because Dudley was "abusing NYCHA time and attendance rules" regarding unscheduled sick leave.  (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 46 (Gelbfish Decl.) ¶ 3)  According to Gelbfish, Dudley frequently arrived at work late or left early claiming to be sick.  (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 45)  Dudley would also unexpectedly call in sick, and on some of these occasions, he later arrived at work.  (Id.)  Dudley would also claim to be sick when asked follow-up questions about work assignments, and would seek leaves of absence for illness after requests for "personal days" were denied.  (Id.)  Gelbfish further claims that – when asked for doctor's notes – Dudley sometimes submitted notes without the required signature or with a signature that resembled Dudley's.  (Id. ¶ 52)

## III.   PLAINTIFF'S DISABILITY CLAIMS

Dudley also claims that NYCHA discriminated against him because of his "disabilities."  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 92)  Dudley asserts that that he has respiratory problems which were exacerbated by airborne contaminants after the September 11, 2001 terrorist attacks.  (Id. ¶ 91)  He suffers from asthma, nose bleeds and headaches.  (Id.)  He also claims that he tore his meniscus in fall 2009 and – as noted above – had surgery on the knee in March 2010.  (Id.)  Dudley also alleges that he has a torn rotator cuff resulting from a motor vehicle accident in spring 2010.  (Id.)

Dudley claims that Gelbfish discriminated against him by insisting that he follow HR regulations regarding time off, telling him to report to work when he claimed to be sick, asking for Dudley's medical diagnoses, and requiring doctor's notes. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 92) He also alleges that Gelbfish and Orlowski discriminated against him by requiring him to report to work at a target reporting time. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 92, 93) He claims that by imposing these requirements, NYCHA failed to accommodate his disabilities. (Id. ¶ 92)

There is no evidence in the record that Plaintiff ever requested any accommodation from his supervisors, however.

## IV. PLAINTIFF'S JOB PERFORMANCE

### A. Supervisors' Concerns about Dudley's Work Performance

Gelbfish claims that – throughout his time as Dudley's supervisor – he had concerns about Dudley's work performance. (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶¶ 8, 50; Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 3 (Gelbfish Dep. Tr.) at 13) In addition to the lateness and attendance issues described above, Gelbfish claims that Dudley had difficulties completing assignments and doing so in a timely manner. (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 50) According to Gelbfish, Dudley was assigned increasingly less complicated work, but even then was unable to understand and complete it. (Id.)

At some point, Gelbfish and Orlowski informed Marano of their concerns regarding Dudley's lateness, attendance, and work performance. (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 48; Pltf. R. 56.1 (Dkt. No. 34) ¶ 48) Marano told them to "work it out within the department." (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 49; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 49; Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 5 (Marano Dep. Tr.) at 21-22)

Dudley maintains that his work performance under Gelbfish was no different than his work performance during the nine years he worked at NYCHA. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 50) According to Dudley, his work performance was considered satisfactory until he came under Gelbfish's supervision. (Id.; Dudley Aff. (Dkt. No. 33) ¶ 3)

B.    **Disciplinary Procedures at NYCHA**

In the event of employee misconduct or inadequate work performance, NYCHA supervisors have the authority to issue counseling and instructional memoranda to employees. (See Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 62; see also Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 24), Ex. 33) A counseling memorandum is a record of particular events or conduct that may be construed as misconduct or incompetent work performance. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 62) Counseling memoranda provide employees with notice of perceived misconduct or poor work performance, so that they can improve in these areas. (Id.; see also Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 24), Ex. 33) According to NYCHA's written policies, counseling memoranda usually become part of an employee's official record. (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 24), Ex. 33 at 1)

Instructional memoranda also address workplace conduct or job performance. (See Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 62) Unlike counseling memoranda, instructional memoranda provide the employee with formal written instructions (id.), and – according to NYCHA's written policies – are usually not included in an employee's official file. (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 24), Ex. 33 at 1)

At NYCHA, employee misconduct or inadequate work performance sometimes results in a disciplinary hearing. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 68) This process begins when an employee's supervisor brings charges against the employee. (See id. ¶¶ 69, 71, 73, 75,

76) The supervisor and employee then have the opportunity to appear at a hearing before a Trial Officer. (See id. ¶¶ 70-72, 74) The Trial Officer determines whether the employee is guilty of the charges, and – if so – what penalty will be imposed. (See id. ¶¶ 70, 72, 74)

C.   Disciplinary Actions

At some point before July 2010, Orlowski and Gelbfish met to discuss how Dudley's work performance could be improved. (See Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 66; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 66) The two decided that they would meet with Dudley to address his performance. (Id.) If the meetings proved unsuccessful, they would then issue counseling and instructional memoranda. (Id.) Gelbfish was not required to obtain Orlowski's approval to issue such memoranda.[7] (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 65)

Gelbfish and Orlowski also decided that if the meetings and memoranda did not lead to improvement in Dudley's work performance, they would pursue disciplinary hearings. (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 66; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 66) Gelbfish was not required to obtain Orlowski's approval before seeking such a hearing (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 75), and neither Gelbfish nor Orlowski was required to obtain Marano's approval before initiating such a hearing. (Id. ¶ 76)

In 2010, Gelbfish began documenting alleged deficiencies in Dudley's work performance. (Id. ¶ 58) Between July 8, 2010 and December 13, 2011, Dudley was issued 27 counseling memoranda and six instructional memoranda. (Id. ¶¶ 55, 60) Gelbfish prepared 26 counseling memoranda; Orlowski provided one. (Id. ¶ 55; see id. ¶ 60) The memoranda concerned timekeeping issues, Dudley's need to clock-in at his field location, and Dudley's failure to submit appropriate leave of absence requests. (Id. ¶ 59)

---

[7] Marano was not consulted before any counseling or instructional memoranda were issued to Dudley. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 67)

On January 6, 2011, April 5, 2011, and November 22, 2011, three disciplinary hearings were conducted regarding Dudley.  (Id. ¶ 68)

At the January 6, 2011 hearing, Dudley was charged with four instances of insubordination, failure to perform duties, and unsatisfactory performance of duties.  (Id. ¶ 69) The Trial Officer found Dudley guilty on each charge and imposed a six-day suspension without pay.  (Id. ¶ 70)

At the April 5, 2011 hearing, Dudley was charged with absence without leave, insubordination, and failure to complete work assignments.  (Id. ¶ 71)  Dudley did not participate in the hearing.  (Id.)  The Trial Officer found Dudley guilty of each charge and imposed a nine-day suspension without pay.  (Id. ¶ 72)  Dudley appealed to Marano (id. ¶ 77), who upheld the decision and penalty.  (Id. ¶ 78)

At the November 22, 2011 hearing, Dudley was charged with poor time and attendance practices and incorrect processing of computer forms.  (Id. ¶ 73)  The Trial Officer found Dudley guilty of each charge and imposed a ten-day suspension without pay.  (Id. ¶ 74)

Dudley claims that these disciplinary proceedings were brought against him in retaliation for his DEO Complaint against Gelbfish on January 22, 2010 – approximately six months before the first counseling memorandum.  (Id. ¶¶ 81, 82)  He also claims that Orlowski was retaliating against him for his involvement in the Kuperman matter in January 2009 – nearly a year and a half before the first counseling memorandum.  (Dudley Aff. (Dkt. No. 33) ¶ 4)

V.     **PLAINTIFF'S TRANSFER OUT OF THE BST**

On November 28, 2011, and December 22, 2011, Dudley complained to Marano that Gelbfish had taken discriminatory and retaliatory actions against him, citing the January 5,

28

2011 incident at his cubicle, the counseling memoranda, and the disciplinary hearings. (Pltf. R. 56.1. Stmt. (Dkt. No. 34) ¶ 82)  Dudley requested a transfer out of the BST. (Id.)

Marano spoke with another NYCHA supervisor Vincent Papia and Orlowski about Dudley's allegations. (Id. ¶ 83)  Papia and Orlowski stated that they did not believe the allegations. (Id.)  Nevertheless, the three decided to transfer Dudley to a different department. (Id.)

On January 13, 2012, Dudley was transferred from the BST to the Process and Information Management Department ("PIMD"). (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 85) According to Marano, the transfer did not change Dudley's job title or responsibilities. (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 5 (Marano Dep. Tr.) at 32)

In the PIMD department, Dudley was supervised by Peter Quercia. (Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 16)  Dudley claims that he is the only black employee under Quercia's supervision. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 86)  Between April 9, 2012 and June 4, 2012, Dudley received four counseling memoranda from Quercia. (Id.)  The memoranda charged Dudley with failing to notify supervisors of unscheduled leaves of absence, insubordination or misconduct regarding assignments, and gross dereliction of duty in connection with his failure to monitor printing functions at NYCHA walk-in centers. (Id.)

## VI.    PROCEDURAL HISTORY

Sometime between November 2010 and January 19, 2011, Dudley filed a Charge of Discrimination with the EEOC. (Def. R. 56.1 Stmt. (Dkt. No. 26) ¶ 79; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 79)  The EEOC issued a Right to Sue Letter on January 11, 2012. (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 87)

The Complaint in this action was filed on April 10, 2012.  (Cmplt. (Dkt. No. 1))
Dudley asserts claims for (1) racial discrimination and (2) retaliation for opposing
discrimination, under Title VII, the NYSHRL, and the NYCHRL.  He also asserts claims for
disability discrimination under the ADA, the NYSHRL, and the NYCHRL, and for violation of
his right to equal protection under 42 U.S.C. § 1983.

On November 4, 2013, Defendants moved for summary judgment on all claims.
(Dkt. No. 22)

**DISCUSSION**

## I.   LEGAL STANDARD

Summary judgment is warranted where the moving party shows that "there is no
genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes
where the evidence is such that a reasonable jury could decide in the non-movant's favor."
Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d
140, 145 (2d Cir. 2007)).  In deciding a summary judgment motion, the Court "resolve[s] all
ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the
party opposing summary judgment." Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"In cases based on allegations of [discrimination and] discriminatory retaliation,
courts must use 'an extra measure of caution' in determining whether to grant summary
judgment 'because direct evidence of discriminatory intent is rare and such intent often must be
inferred from circumstantial evidence.'" Thompson v. Morris Heights Health Ctr., No. 09 Civ.
7239 (PAE) (THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v.
Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)).

However, "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination [and retaliation] cases than to . . . other areas of litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)).  As in any other case, a plaintiff in a discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . [H]e must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  "Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion.  Gross v. Nat'l Broad. Co., Inc., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

## II.    RACE DISCRIMINATION CLAIMS

### A.    Legal Standard

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1).  "An employment decision . . . violates Title VII when it is 'based in whole or in part on discrimination.'" Holcomb, 521 F.3d at 137 (quoting Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004)) (emphasis omitted).

"Title VII discrimination claims are assessed using the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)."

Joseph v. Owens & Minor Distribution, Inc., No. 11-CV-5269 MKB, 2014 WL 1199578, at *6

(E.D.N.Y. Mar. 24, 2014).  "Under the framework, a plaintiff must first establish a prima facie

case of discrimination.  The plaintiff's burden at this stage is 'minimal.'"  Id. (quoting Holcomb,

521 F.3d at 139).  "If the plaintiff satisfies this initial burden, the burden then shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for its actions."  Id.  "'If the

employer is able to satisfy that burden, the inquiry then returns to the plaintiff, to demonstrate

that the proffered reason is a pretext for discrimination.'"  Id. (quoting United States v. City of

New York, 717 F.3d 72, 102 (2d Cir. 2013)).

"To meet th[e] burden [of proving a prima facie Title VII discrimination case], a

plaintiff must show:  (i) membership in a protected class; (ii) qualifications for the position; (iii)

an adverse employment action; and (iv) circumstances surrounding that action giving rise to an

inference of discrimination."  Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002).

Hostile work environment claims are likewise actionable under Title VII.  "An

employee seeking to bring a hostile work environment claim must demonstrate the following:

(1) [he] is a member of a protected class; (2) [he] suffered unwelcome harassment; (3) [he] was

harassed because of [his] membership in a protected class; and (4) the harassment was

sufficiently severe or pervasive to alter the conditions of employment and create an abusive work

environment."  Costello v. New York State Nurses Ass'n, 783 F. Supp. 2d 656, 672 (S.D.N.Y.

2011) (emphasis in original).  "It is '"axiomatic" that in order to establish a [race]-based hostile

work environment [claim] . . . a plaintiff must demonstrate that the conduct occurred because of

[his] [race].'"  Brown v. Orange & Rockland Utils., Inc., 594 F. Supp. 2d 382, 391 (S.D.N.Y.

2009) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)).

Both the NYSHRL and the NYCHRL -- like Title VII -- require proof of discriminatory intent to prove a prima facie case of race discrimination and hostile work environment. See, e.g., White v. Pacifica Found., 973 F. Supp. 2d 363, 383 (S.D.N.Y. 2013) (granting summary judgment on defendant-employer's NYSHRL and NYCHRL discrimination claims where plaintiff did not offer any evidence of discriminatory intent on the part of those involved in alleged adverse employment actions); Lennert-Gonzalez v. Delta Airlines, Inc., No. 11 Civ. 1459 (JMF), 2013 WL 754710, at *8 (S.D.N.Y. Feb. 28, 2013) (granting defendant-employer's motion for summary judgment on Title VII, NYSHRL, and NYCHRL claims when there was no evidence to indicate that defendant acted "even in part" with a discriminatory motive).

**B.      The Record Does Not Support an Inference of Discrimination**

Dudley asserts disparate treatment and hostile work environment claims, alleging that Defendants discriminated against him because of his race.  Dudley's claims fail, however, because there is no evidence that any of Defendants' actions were racially-motivated.

"Inference of discrimination 'is a "flexible [standard] and can be satisfied differently in differing factual scenarios."'" Joseph, 2014 WL 1199578, at *7 (quoting Howard v. MTA Metro-N. Commuter R.R., 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996))) (alteration in Joseph). "An inference of discrimination can be drawn from circumstances such as 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's [adverse

employment action suffered by Plaintiff].'" Id. (quoting Abdu-Brisson, 239 F.3d at 468) (alteration in Joseph).

Dudley claims that the following facts support an inference of racial discrimination here:

> (1) Plaintiff's similarly situated coworkers[,] who were not African American, were not similarly subjected to the discipline and treatment to which Plaintiff was subjected; (2) the discipline and adverse actions taken against Plaintiff were pretextual in nature, as the bas[es] for the counseling memoranda, and the other action[s] taken against Plaintiff w[ere] false; and, (3) Orlowski's derogatory racial comments towards Plaintiff, which were relayed to Plaintiff by a co[-]worker, all evidence an inference of discrimination.

(Pltf. Br. (Dkt. No. 31) at 17)  For the reasons discussed below, none of these assertions -- alone or in the aggregate – support an inference of discrimination.

### 1.    Disparate Treatment

"A plaintiff may raise . . . an inference [of discrimination] by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  "When considering whether a plaintiff has raised an inference of discrimination by showing that [he] was subjected to disparate treatment, [the Second Circuit] ha[s] said that the plaintiff must show [he] was 'similarly situated in all material respects' to the individuals with whom [he] seeks to compare [himself]." Id. (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)).  "[T]o satisfy [the] 'all material respects' standard for being similarly situated, a plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards." Id. at 40.  "In addition, the standard . . . requires plaintiff to show that similarly situated employees who went undisciplined engaged in comparable conduct." Id.

34

Here, Dudley has not demonstrated that he was treated differently than any similarly situated co-workers at NYCHA.  As a preliminary matter, his claims that he was treated differently from unspecified "non-black co[-]workers" (see, e.g., Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 16) are conclusory and devoid of evidentiary support, and therefore do not raise a genuine issue of material fact.  See Whethers v. Nassau Health Care Corp., 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013), aff'd, No. 13-2991, 2014 WL 4637215 (2d Cir. Sept. 18, 2014) (summary order) ("These allegations[ ] . . . do not provide sufficient evidence that defendants treated her less favorably than similarly situated employees because plaintiff fails to name similarly situated individuals with similar job titles and responsibilities."); see also Walder v. White Plains Bd. of Educ., 738 F. Supp. 2d 483, 500 (S.D.N.Y. 2010) ("Walder relies on conclusory allegations that males were given '[f]avorable treatment.'  Such conclusory allegations are insufficient [to give rise to an inference of discrimination]"); Gross, 232 F. Supp. 2d at 67 ("Mere conclusory statements . . . cannot by themselves create a genuine issue of material fact.  This applies no less to discrimination cases. . . .").

The only co-workers that Dudley points to as similarly-situated are Nina Winer, Andy Lackrajh, and Jimmy Xie.

Winer – who is white – was Gelbfish's only other supervisee.  (See Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 8)  While Dudley claims that Winer "perform[ed] technical work and was involved in technical matters" (Dudley Aff. (Dkt. No. 33) ¶ 5; see also Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 8), there is no dispute that Winer held a different position than Dudley.  (See Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 8)  Specifically, she was an administrative staff analyst, not a Computer Specialist.  (Id.)  There is no evidence that she was assigned to the Qmatic project, as Dudley was, or that she was ever assigned to a project off-site.  Nor is there any evidence as to

35

what hours she was required to work; whether her schedule was changed; or whether her position was subject to different policies on lateness, days off, and absences than Dudley's position.  The record also does not indicate how often she was late or absent from work.  As to her work performance, it is undisputed that she performed her work in a satisfactory manner.  (Id.)

Lackrajh – who is Indian – is a Computer Specialist and is the administrator of the Qmatic project.  Indeed, as Dudley testified, Lackrajh is the "chief person" on the Qmatic project.  (Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 103)  Accordingly, Lackrajh – unlike Dudley – is in a leadership role at NYCHA.  There is no evidence that, in that position, he is subject to the same rules of conduct as Dudley.  Moreover, as Dudley acknowledges, Lackrajh does not report to Gelbfish, and Gelbfish is not responsible for monitoring Lackrajh's work hours.  (Id. at 89)  Dudley has also not submitted evidence of Lackrajh's work performance, lateness, or attendance.  Although Dudley testified that Lackrajh took some days off, Dudley could not say how many days he had taken off.  (Id. at 105-06)

Xie appears to be a Computer Specialist, and at times he was assigned to projects with Dudley, including the Qmatic project.[8]  Dudley has offered no evidence of Xie's experience level, length of employment at NYCHA, work performance, work schedule, disciplinary history, or attendance record, however.  Nor does the record indicate that Xie – who was supervised by Orlowski and not by Gelbfish – was subject to the same disciplinary standards, or lateness and attendance policies as Dudley.  See Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 465 (S.D.N.Y. 2006) ("In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated.").  While Dudley claims

---

[8]  Dudley has not directed the Court to anything in the record indicating Xie's race.  For purposes of Defendants' motion, this Court has assumed that Xie is Asian.

that Xie -- unlike Dudley -- was not required to "change [his] schedule" while working on the

Qmatic project (see Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 28), Dudley offers no evidence of what

Xie's schedule was prior to or while he was working on the Qmatic project.  Dudley's argument

that Xie was never removed from Flex Time (Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013

Dudley Dep. Tr.) at 104) also carries no weight, because Dudley acknowledges that he does not

know Xie's attendance history.  (Id. at 106)

   Given this record, no reasonable jury could find that Dudley was treated

differently than similarly situated non-black co-workers.  Winer and Lackrajh hold different

positions and levels of responsibility at NYCHA than Dudley.  Moreover, Dudley has provided

no evidence that he and Xie are similar in terms of work experience, responsibility, or

competence.  Xie and Lackrajh also report to Orlowski, and not to Gelbfish.  Perhaps most

significantly, there is no evidence that any of these NYCHA employees were comparable to

Dudley in terms of lateness, attendance, and work performance.  See Graham, 230 F.3d at 40.

Accordingly, the record provides no support for Dudley's claim that he was treated differently

from "similarly situated" co-workers.

### 2. "Pretextual" Actions

   Dudley also alleges that an inference of discrimination can be drawn from the fact

that "the discipline and adverse actions taken against Plaintiff were pretextual in nature, as the

basis for the counseling memoranda, and the other action taken against Plaintiff was false."

(Pltf. Br. (Dkt. No. 31) at 17)  In particular, Dudley claims that Gelbfish fabricated the bases for

the counseling memoranda, instructional memoranda, and disciplinary hearings, and instead took

these actions against Dudley based on his race.  (See, e.g., Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶

50-51)  In support of this claim, Dudley points to the fact that his "performance was deemed satisfactory" before Gelbfish became his supervisor.  (Id. ¶ 50)

Even accepting Dudley's claim that he did not receive poor performance reviews until he was assigned to Gelbfish, this change is not enough to demonstrate discriminatory intent. "[C]ourts in this Circuit have found that a change in performance reviews, without more, does not lead to an inference of discriminatory motive." Johnson v. N.Y.C. Dep't of Educ., No. 10-CV-2604 WFK, 2014 WL 4090844, at *9 (E.D.N.Y. Aug. 19, 2014).  "'In fact, such an inference is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda.'" Gambello v. Time Warner Commc'ns, Inc., 186 F. Supp. 2d 209, 222 (E.D.N.Y. 2002) (quoting Brown v. Time, Inc., No. 95 Civ. 10081 (MBN), 1997 WL 231143, at *12 (S.D.N.Y. May 7, 1997)).  "The mere fact that Plaintiff had a better relationship with or received better evaluations from previous supervisors does not, on its own, raise an inference of discrimination." Davis v. Oyster Bay-E., No. 03-CV-1372 (SJF) (JO), 2006 WL 657038, at *11 (E.D.N.Y. Mar. 9, 2006), aff'd, 220 F. App'x 59 (2d Cir. 2007) (summary order).  "As a matter of law, [an employee's] disagreement with [his] employer's evaluation of [his] behavior or performance is not evidence of discriminatory intent." Risco v. McHugh, 868 F. Supp. 2d 75, 104 (S.D.N.Y. 2012).  Accordingly, "[t]hat [Dudley] received better ratings from [his previous supervisors], under different circumstances, cannot result in an inference of discrimination against [Gelbfish]." Johnson, 2014 WL 4090844, at *9.

Dudley's allegation that Gelbfish fabricated bases for subjecting Dudley to discipline is also not sufficient -- without more -- to demonstrate that Gelbfish took these actions because of Dudley's race. See Risco, 868 F. Supp. 2d at 104 ("Risco's claim that she was 'falsely accused of workplace violence,' and 'subjected to false write-ups' also does not give rise

to an inference that Byrd's conduct was motivated by bias. . . . Even if Byrd did exaggerate or lie about Risco's conduct or performance, there is no evidence in the record to support a finding that he did so in order to conceal any prohibited motivation based on Risco's race or color."). Nothing in the record supports Dudley's claim that Gelbfish's conduct was racially motivated. Indeed, Dudley concedes that Gelbfish never made any derogatory statements about his race. (See Dudley Aff. (Dkt. No. 33), Ex. A (June 14, 2013 Dudley Dep. Tr.) at 225-26)

### 3. Racial Comments

Finally, Dudley asserts that – at some point between 2009 and 2012 – one of Dudley's co-workers – Mitch Goldberg – told Dudley that Orlowski had used a racial slur in discussing Dudley with Goldberg. (Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 37-41) Dudley argues that Orlowski's use of this racial slur supports an inference of discrimination. (See Pltf. Br. (Dkt. No. 31) at 17)

When asked about this alleged comment at his deposition, Dudley stated:

Q: What did Mitch Goldberg tell you? When did this happen?

A: I'm not sure when it happened, but it did happen.

. . .

Q: What did Mr. Goldberg tell you about this conversation he had with Mr. Orlowski?

A: He didn't tell me in detail, but he said there was a derogatory comment that occurred.

Q: He didn't tell you what the comment was?

A: No.

Q: Did he say the comment was based on your race?

A: It was a derogatory – it was a racial slur, yes.

39

Q: You didn't ask him what that slur was?

A: No.

Q: I realize this was a few years ago, but can you vaguely tell me how the conversation came about?

A: I don't recall.

Q: So you don't recall anything about this conversation except that Mr. Goldberg mentioned that Mr. Orlowski used some kind of slur regarding you?

A: Yes.

(Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 38-40)

Dudley provides no details regarding the actual content of this alleged comment, the context in which it was made, or when – over a three-year period – Goldberg reported this comment to Dudley (or when Orlowski allegedly used the slur in speaking with Goldberg). "Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to [take an adverse employment action as to] the plaintiff." Silver v. N. Shore Univ. Hosp., 490 F. Supp. 2d 354, 362 (S.D.N.Y. 2007). "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007). "In determining whether a remark is probative [of discriminatory intent], [courts in this District] have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made

(i.e., whether it was related to the decision-making process)." Henry v. Wyeth Pharm., Inc., 616

F.3d 134, 149 (2d Cir. 2010); see Silver, 490 F. Supp. 2d at 363 (same).

Here, the alleged and undefined racial slur was made by a decisionmaker –

Orlowski. Dudley has adduced no evidence, however, as to when the remark was made in

relation to any adverse employment action, what the actual content of the remark was, or what

the context for the comment was. Dudley has therefore provided no evidence of a "nexus"

between Orlowski's "remote and oblique" comment and any adverse action. Under such

circumstances, no reasonable juror could infer that any alleged adverse employment action taken

against Dudley was motivated by racial animus. See Greene v. Brentwood Union Free Sch.

Dist., 966 F. Supp. 2d 131, 139-40 (E.D.N.Y. 2013), aff'd sub nom. Brown Greene v. Brentwood

Union Free Sch. Dist., No. 13-3532-CV, 2014 WL 4099288 (2d Cir. Aug. 21, 2014) (summary

order) ("Plaintiff argues that she has offered direct evidence of Taliey's discriminatory animus,

including . . . Jones' deposition testimony that she believed Talley had made racially

discriminatory statements about [plaintiff]. . . . [E]ven if there were admissible evidence of

Talley's past comments, they are 'not probative of the defendants' motive for taking action

against Greene,' because the comments are 'remote and oblique . . . in relation to the employer's

adverse action.'" (quoting Tomassi, 478 F.3d at 115).

Moreover, given Orlowski's legitimate, non-discriminatory explanations for the

actions he took with respect to Dudley, this isolated alleged comment is not sufficient to defeat a

motion for summary judgment. Specifically, Orlowski stated that he assigned Dudley to earlier

work hours because the Customer Contact Centers – which open at 8:00 a.m. – were having

difficulties with the Qmatic project that Dudley was assigned to support. Moreover, Defendants

have demonstrated that the disciplinary actions against Dudley were taken in response to a well-

documented history of absences, tardiness, and deficiencies in his work performance.

Accordingly, even assuming <u>arguendo</u> that Dudley has introduced evidence of "[racial] bias in

the testimony about [Orlowski's] statements[,] . . . <u>some</u> evidence is not sufficient to withstand a

properly supported motion for summary judgment." <u>See</u> <u>Woroski v. Nashua Corp.</u>, 31 F.3d 105,

109-10 (2d Cir. 1994), <u>abrogated on other grounds by</u> <u>Reeves v. Sanderson Plumbing Prods.</u>,

<u>Inc.</u>, 530 U.S. 133 (2000) (emphasis in original). "[T]he stray remarks of a decision-maker,

without more, cannot prove a claim of employment discrimination." <u>See</u> <u>Abdu-Brisson</u>, 239

F.3d at 468 (citing <u>Woroski</u>, 31 F.3d at 109).

Given that Dudley cannot (1) testify as to what the alleged racial slur was; (2)

provide any context for the alleged remark; (3) provide a reasonable range in terms of when the

alleged remark was made; or (4) demonstrate that the alleged remark was made in proximity to

some alleged adverse action taken against him; and given that Orlowski has offered legitimate

explanations for the actions taken with respect to Dudley, no reasonable factfinder could

conclude – from this evidence -- that Defendants' actions toward Dudley were racially

motivated.[9]

* * * *

"Title VII is not a remedy for all disgruntled employees who are members of a

protected class. It should not be exploited through misuse and misapplication." <u>Dean v.</u>

<u>Westchester Cnty. Dist. Attorney's Office</u>, 119 F. Supp. 2d 424, 430 (S.D.N.Y. 2000). "Those

who seeks its protection must allege and prove their entitlement thereto. In this case, plaintiff's

---

[9]  To the extent Dudley argues that Marano's alleged "lazy" remark demonstrates racial animus, this argument is meritless. Even assuming <u>arguendo</u> that Marano referred to Dudley as "lazy," this is not a racial remark. (Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 45-46) Similarly, Dudley's claim that Doug Heyward "had . . . problems" getting a transfer to another work group because Marano "ha[s] a problem with African Americans" (<u>id.</u> at 49-51) is conclusory and raises no inference of discrimination.

conclusory allegations of harassment and discrimination are inadequate." Id.  Because Dudley

has not offered evidence "sufficient to permit a rational finder of fact to infer that the defendant's

employment decision was more likely than not based in whole or in part on discrimination,"

Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997), he has not established a prima

facie case of discrimination under Title VII, the NYSHRL, or the NYCHRL.  Accordingly,

Defendants' motion for summary judgment on Dudley's discrimination and hostile work

environment claims will be granted.

## III.   RETALIATION CLAIMS

### A.      Legal Standards for Retaliation

Under Title VII, it is unlawful

> for an employer to discriminate against any of his employees or applicants for
> employment, for an employment agency, or joint labor-management committee
> controlling apprenticeship or other training or retraining, including on-the-job
> training programs, to discriminate against any individual, or for a labor
> organization to discriminate against any member thereof or applicant for
> membership, because he has opposed any practice made an unlawful employment
> practice by this subchapter, or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding, or hearing under this
> subchapter.

42 U.S.C. § 2000e-3(a).

"Title VII . . . retaliation claims are . . . analyzed under the three-step burden-

shifting framework . . . in McDonnell Douglas." Risco, 868 F. Supp. 2d at 98.  To establish a

prima facie case of retaliation, "an employee must show '(1) participation in a protected activity;

(2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a

causal connection between the protected activity and the adverse employment action.'" Jute v.

Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (quoting McMenemy v. City of

Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001)).

Like Title VII, both the NYSHRL and the NYCHRL require a causal connection between an adverse act and a protected activity to prove a retaliation claim.  See E.E.O.C. v. Bloomberg L.P., 967 F. Supp. 2d 816, 862 (S.D.N.Y. 2013) ("[T]he NYCHRL['s] . . . broader standard [for retaliation] does not absolve [plaintiff] from putting forth evidence tending to show a causal connection between [his] action[s] opposing [defendants'] alleged discrimination and the alleged adverse actions."); Bryant v. Merrill Lynch, Pierce, Fenner & Smith, No. 12 CV 2940 (HB), 2013 WL 2359109, at *5 (S.D.N.Y. May 30, 2013) ("Because the federal and state retaliation claims on which summary judgment is granted fail because of the absence of retaliatory animus, they also fail under the broader NYCHRL.").

"A causal connection between the protected activity and the adverse action may be demonstrated by showing '(1) direct proof of retaliatory animus directed against the [p]laintiff, (2) disparate treatment of similarly situated employees, or (3) that the retaliatory action occurred close in time to the protected activities.'"  Elhanafy v. Shinseki, No. 10 CV 3192 (JG), 2012 WL 2122178, at *17 (E.D.N.Y. June 12, 2012) (quoting Ashok v. Barnhart, 289 F. Supp. 2d 305, 314 (E.D.N.Y. 2003)).

"Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a prima facie case."  Aka v. Jacob K. Javits Convention Ctr. of N.Y., No. 09 Civ. 8195 (FM), 2011 WL 4549610, at *9 (S.D.N.Y. Sept. 30, 2011) (citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932-33 (2d Cir. 2010)).  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse . . . action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be

44

'very close,'" however.  Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (quoting

O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)).

   "Th[e] [Second Circuit] has not drawn a bright line to define the outer limits

beyond which a temporal relationship is too attenuated to establish a causal relationship between

the exercise of a federal constitutional right and an allegedly retaliatory action."  Gorman-Bakos

v. Cornell Co-op Extension of Schenectady Cnty., 252 F.3d 545, 554 (2d Cir. 2001).  As a

general matter, "'[d]istrict courts in this Circuit have consistently held that a passage of more

than two months between the protected activity and the adverse . . . action does not allow for an

inference of causation.'"  Williams v. Woodhull Med. & Mental Health Ctr., No. 10 CV 1429

(NGG) (LB), 2012 WL 555313, at *2 (E.D.N.Y. Jan. 31, 2012), report and recommendation

adopted sub nom., Williams v. Woohdull Med. & Mental Health Ctr., No. 10-CV-1429 (NGG)

(LB), 2012 WL 567028 (E.D.N.Y. Feb. 21, 2012) (quoting Garrett v. Garden City Hotel, Inc.,

No. 05-CV-0962 (JFB) (AKT), 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (collecting

cases)).  Stated another way, "[t]hree months is on the outer edge of what courts in this circuit

recognize as sufficiently proximate to admit of an inference of causation."  Yarde v. Good

Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); see also Woods v. Enlarged City

Sch. Dist. of Newburgh, 473 F. Supp. 2d 498, 529 (S.D.N.Y. 2007), aff'd sub nom., Woods v.

Newburgh Enlarged City Sch. Dist., 288 F. App'x 757 (2d Cir. 2008) (collecting cases); Gentile

v. Potter, 509 F. Supp. 2d 221, 239 & n.9 (E.D.N.Y. 2007) (dismissing retaliation claim

premised on act that occurred four months after protected activity where there was no direct

evidence of retaliation); Nicastro v. Runyon, 60 F. Supp. 2d 181, 185 (S.D.N.Y. 1999) ("Claims

of retaliation are routinely dismissed when as few as three months elapse between the protected

EEO activity and the alleged act of retaliation.").

B.   **Dudley Has Not Demonstrated a Causal Connection**
     **Between A Protected Activity and an Adverse Action**

Dudley claims that he was retaliated against because (1) on January 27, 2009, he provided information during the investigation of Kuperman's discrimination claim; (2) on January 27, 2010, he filed a complaint against Gelbfish with the DEO; (3) in January 2010, he complained to the DEO about Gelbfish's clocking-in requirements at the Brooklyn site; (4) in November 2010, he filed a discrimination complaint before the EEOC; (5) in a March 2011 email, he complained to Marano that Gelbfish was discriminating against him; and (6) in a November 2011 email, he complained to Marano that Gelbfish was discriminating against him. (See Pltf. Br. (Dkt. No. 31) at 4-5, 25)  As noted above, to establish a prima facie case of retaliation, Dudley must offer evidence from which a reasonable jury could infer a causal connection between these activities and an adverse action.  Dudley claims that he has shown such a connection "through the timing and sequence of events, as well as through the pretextual nature of the actions taken against [him]."  (Id. at 25)

1.   **Dudley's January 27, 2009**
     **Participation in the Kuperman Investigation**

Dudley argues that his supervisors retaliated against him because he spoke to a DEO investigator on January 27, 2009, who was investigating Kuperman's claim of discrimination against Orlowski.  (Pltf. Br. (Dkt. No. 31) at 4)  Dudley claims that, as a result, he was denied transfer requests, required to select a designated lunch hour, and told to arrive to work by 8:15 a.m.  (See Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 14-16, 28, 84)

Dudley has demonstrated no causal connection between any of these alleged "retaliatory" acts and his participation in the Kuperman investigation, however.  As an initial matter, he has offered no direct proof of retaliatory animus.  There is no evidence, for example,

that any of his supervisors ever spoke to him – positively or negatively – about his participation in the investigation, or that they ever discussed his participation in that investigation when deciding to deny his transfer requests, to require him to commit to select a lunch hour, or to report to work earlier.

Nor has Dudley produced evidence that similarly situated employees – who did not participate in the Kuperman investigation – were treated differently. As noted above, the only co-workers Dudley points to – Winer, Xie, and Lackrajh – are not similarly situated. Moreover, both Xie and Winer – like Dudley – provided information regarding Kuperman's complaint to investigators. While Winer and Dudley were later transferred to Gelbfish's supervision, Xie and Kuperman herself continued to be directly supervised by Orlowski, thereby undermining Dudley's claim that he was transferred to Gelbfish's supervision because of the interview he gave in the Kuperman investigation. (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 2 (June 14, 2013 Dudley Dep.) at 216; Feb. 4, 2014 Orlowski Decl. (Dkt. No. 29) ¶ 3)

Finally, the temporal relationship between Dudley's January 27, 2009 interview and any alleged "retaliatory" act is too attenuated to permit an inference of causation. The first "adverse action" alleged after January 27, 2009 is Orlowski's June 4, 2009 denial of Dudley's transfer request – more than four months later. The denial of the transfer request, and the other alleged "retaliatory acts" that follow – including Gelbfish's June 8, 2009 email directing Dudley to select a lunch hour, and Orlowski's February 18, 2010 email directing Dudley to report to work at 8:15 a.m. – are too far removed in time to support an inference that Dudley was retaliated against. See, e.g., Gentile, 509 F. Supp. 2d at 239.

2.    <u>Dudley's Complaints to the DEO in January 2010</u>

Dudley also claims that his supervisors retaliated against him for filing a DEO complaint against Gelbfish on January 17, 2010, and for complaining to the DEO about Gelbfish's clocking-in requirement at the Brooklyn site in mid-to-late January 2010.  (Pltf. Br. (Dkt. No. 31) at 4-5)  According to Dudley, this "retaliation" included (1) Orlowski requiring him to report to work at 8:15 a.m. starting on February 19, 2010; (2) Gelbfish removing him from Flex Time in June 30, 2010; (3) Gelbfish requiring him to submit doctor's notes for unanticipated leaves of absence beginning in June 2010; (4) Gelbfish and Orlowski issuing counseling and instructional memoranda to him, beginning on July 8, 2010; and (5) Defendants subjecting him to disciplinary hearings, beginning in January 2011.  (See Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 16, 28-29, 45, 47, 50, 81)

Again, Dudley has offered no direct evidence of retaliatory animus, nor has he demonstrated that he was treated differently from similarly situated co-workers who did not lodge complaints with the DEO.  Furthermore, all but one of these actions took place in June 2010 or later – approximately five months or more after Dudley filed his complaints with the DEO.  The temporal relationship between Dudley's DEO complaints and these alleged retaliatory actions is thus too remote to raise a genuine issue of material fact as to retaliatory animus.[10]

---

[10]  Dudley argues that he worked for Gelbfish for a year before receiving any counseling memoranda, and that accordingly the onset of the counseling memoranda must be retaliatory. (See Pltf. Br. (Dkt. No. 31) at 25)  As discussed above, however, there is a lapse of approximately five months between Dudley's DEO complaints and the first counseling memorandum, which is too large of a temporal gap to infer a causal connection.  Moreover, the fact that Dudley began receiving counseling memoranda in July 2010 is consistent with Defendants' evidence that – leading up to that period – Gelbfish had been documenting issues with Dudley's performance and attendance, and that Orlowski and Gelbfish had decided to use

Although the change in Dudley's start time on February 19, 2010, occurred close in time to his DEO complaints, his retaliation claims premised on this event still fail, because he has not demonstrated an adverse action. "Title VII's anti-retaliation provision applies broadly to 'employer actions that would have been materially adverse to a reasonable employee.'" Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (quoting Burlington N. & Santa Fe R.R. Co. v. White, 548 U.S. 53, 57 (2006)). "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination,'" however. Id. at 162 (quoting White, 548 U.S. at 57). "Title VII 'does not set forth "a general civility code for the American workplace."'" Id. (quoting White, 548 U.S. at 68 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998))). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." White, 548 U.S. at 67. "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. at 68. "[B]y considering the perspective of a reasonable employee, White bespeaks an objective standard" of material adversity. Hicks, 593 F.3d at 165 (emphasis in original).[11]

Here, Orlowski requested that Dudley report to work at 8:15 a.m., with a 15 minute grace period – an hour and fifteen minutes earlier than Dudley's previous start time.

---

counseling and instructional memoranda to address these deficiencies. (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Exs. 12, 18; Def. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 58, 66)

[11] The standard is the same under the NYSHRL. See Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ., 866 F. Supp. 2d 147, 162 (E.D.N.Y. 2011) ("Retaliation claims under the [NY]SHRL are analyzed identically to Title VII claims." (citing Hicks, 593 F.3d at 164)). Under the NYCHRL, however, "the employer's conduct need not be as severe to trigger liability. Unlike under federal and state law, the employer's actions need not be 'materially adverse' to the plaintiff, but merely 'reasonably likely to deter a person from engaging in protected activity.'" Sotomayor v. City of New York, 862 F. Supp. 2d 226, 262 (E.D.N.Y. 2012), aff'd, 713 F.3d 163 (2d Cir. 2013) (quoting N.Y.C. Admin. Code § 8-107(7)).

Even under the more generous standard of the NYCHRL, no reasonable factfinder could find it "reasonably likely" that such a trivial change in an employee's work hours would deter a reasonable employee from filing a discrimination complaint. See Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 80 (1st Dep't 2009) ("[S]ummary judgment will still be available [on a NYCHRL retaliation claim] where [employers] can prove that the alleged discriminatory conduct in question does not represent a 'borderline' situation but one that could only be reasonably interpreted by a trier of fact as representing no more than petty slights or trivial inconveniences."). While the question of whether a change in an employee's schedule constitutes a retaliatory action "will often depend upon the particular circumstances," White, 548 U.S. at 69, Dudley has not introduced any evidence of unique or unusual circumstances here. Rather, Dudley's only claim is that it took him longer to commute to work. See Korzeniewski v. New York, No. 12-CV-727, 2013 WL 6148076, at *8 (W.D.N.Y. Nov. 22, 2013) (finding no material adverse action under Title VII where "plaintiff allege[d] no extenuating circumstances attending the change of her work schedule by one half hour"); Seale v. Madison Cnty., 929 F. Supp. 2d 51, 76 (N.D.N.Y. 2013) ("Although courts have found a change in work schedule to be sufficiently adverse for purposes of plausibly alleging a retaliation claim [under Title VII and the NYSHRL], there must be some extenuating circumstance, of which the plaintiff alleges her employer was aware, that transforms such a change from merely inconvenient to materially adverse."). The fact that Dudley's commute was allegedly even longer after he had knee surgery does not change the analysis here, because Dudley was assigned to the earlier work schedule several weeks before having surgery. The change in Dudley's work schedule, therefore, was nothing more than an inconvenience, and such trivial matters do not constitute retaliatory actions

even under the NYCHRL's liberal standard, let alone under the "materially adverse" standard of Title VII and the NYSHRL.

Moreover, Orlowski – in assigning Dudley to the earlier schedule – provided a legitimate reason for doing so: Dudley was assigned to client support for the Qmatic program, which opens at 8:00 a.m. and which was having "major issues and problems occurring in the morning." (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 17)  Dudley has offered no evidence that this explanation was pretextual.  His claims that his co-workers were not required to change their schedules to work on the Qmatic program carries no weight, because he has not provided any evidence of what their schedules were.  Accordingly, Dudley has not demonstrated an issue of material fact as to whether the change in his work schedule was a retaliatory action. It was not.

### 3.    Dudley's EEOC Complaint in November 2010 and His Complaint to Marano in March 2011

Dudley also claims that he was retaliated against after (1) filing a complaint with the EEOC in November 2010, and (2) complaining to Marano in March 2011 that Gelbfish had discriminated against him by denying his leave of absence requests.  (Pltf. Br. (Dkt. No. 31) at 5) Dudley argues that – in retaliation for these complaints – Defendants issued counseling and instructional memoranda to him and conducted disciplinary hearings that were "false in nature." (See id. at 25)

Dudley has not demonstrated a causal connection between these disciplinary actions and either complaint.  The undisputed evidence demonstrates that Defendants had decided to address Dudley's work performance and tardiness/attendance issues through these disciplinary procedures at least four months before Dudley filed his EEOC Complaint, and at least eight months before Dudley complained to Marano.  (See Def. R. 56.1 Stmt. (Dkt. No. 26)

¶ 66; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 66)  In accordance with this decision, Gelbfish began

issuing memoranda to Dudley in July 2010.  (Id. ¶ 55)  The disciplinary hearings that were held

on January 6, 2011, April 5, 2011, and November 22, 2011 were also consistent with

Defendants' plan concerning how they would address Dudley's work performance and

attendance deficiencies if his conduct did not improve after the memoranda were issued.  (See id.

¶¶ 66, 68)

        In such circumstances, temporal proximity between Defendants' actions and

Dudley's complaints is not sufficient to demonstrate causation.  "Employers need not suspend

previously planned [actions] upon discovering that a [protected activity occurred], and their

proceeding along lines previously contemplated, though not yet definitively determined, is no

evidence whatever of causality." Breeden, 532 U.S. at 272.  "Where timing is the only basis for

a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever

engaged in any protected activity, an inference of retaliation does not arise." Slattery v. Swiss

Reins. Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001), as amended (June 6, 2001).  Although

"[Dudley] claims that [NYCHA's disciplinary actions] followed his complaints closely enough

to support an inference of retaliation[,] . . . in this case the adverse employment actions were

both part, and the ultimate product, of 'an extensive period of progressive discipline' which

began . . . a full [four] months prior to his filing of the EEOC charges." Id. (emphasis in

original).  "[Defendants'] decision to address Plaintiff's poor performance and misconduct was

set in motion before Plaintiff sent his . . . [discrimination] complaint[s].  The fact that

[Defendants] later decided to [issue counseling memoranda to] Plaintiff again and ultimately

[conduct disciplinary hearings] -- after he sent the . . . complaint[s] -- is not proof of retaliation,

because it is clear that [Defendants] [were] 'proceeding along lines previously contemplated,

though not yet definitively determined.'" See White, 973 F. Supp. 2d at 385 (quoting Breeden,

532 U.S. at 272); see also Spadola v. N.Y.C. Transit Auth., 242 F. Supp. 2d 284, 294-95

(S.D.N.Y. 2003) ("Though Spadola points to the proximity between the filing of his EEOC

charge on November 14, 1997 and his second dismissal on November 24, 1997 as sufficient

causation, this evidence is not dispositive.  The investigation that led to the Authority's

disciplinary proceeding arising out of the false overtime charges commenced sometime in July

and the administrative proceedings were well underway at the time Spadola filed his EEOC

charge.  Under these circumstances, the Authority was not obligated to automatically cease or

abandon an ongoing internal disciplinary procedure merely because an employee files a charge

alleging discrimination."); cf. Holmes v. Long Island R.R. Co., No. 96 CV 6196 (NG), 2001 WL

797951, at *8 (E.D.N.Y. June 4, 2001) ("In the present case, similarly, plaintiff Holmes relies

upon the temporal proximity between her filing of charges with the State Division of Human

Rights and the initiation of proceedings that resulted in her discharge, but . . . no facts show a

causal connection between protected activities and her discharge.  There is no evidence that

LIRR knew that plaintiff was about to file or had filed charges when it sent her for drug testing

and then began proceedings for her discharge after the tests revealed that she had used an illegal

controlled substance.  LIRR's continuation of those proceedings, which resulted in plaintiff's

termination, is 'no evidence whatever of causality.'") (quoting Breeden, 532 U.S. at 272).

   Here, neither the filing of Dudley's EEOC complaint, nor Dudley's complaint to

Marano, required Defendants to suspend their plan to address Dudley's work deficiencies

through counseling memoranda and disciplinary hearings – a plan which was initiated at least

four months before Dudley filed his EEOC complaint, and at least eight months before he

complained to Marano.

Similarly, Dudley has not demonstrated that his removal from the Flex Time program in December 23, 2010, or the refusal to reinstate him in the Flex Time program in September 2011, were the result of retaliation for his November 2010 and/or March 2011 complaints. Gelbfish began the process of removing Dudley from Flex Time on June 30, 2010, when he asked the Human Resources department to remove Dudley from the program because of his consistent failure to arrive at work by his 8:15 a.m. target time. (Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 18; Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 33) NYCHA's HR department was not required to suspend its review of that request, or to deny Gelbfish's request, merely because Dudley had filed a complaint with the EEOC. Under such circumstances, mere temporal proximity between the filing of the EEOC Complaint and the removal of Dudley from the Flex Time program is not sufficient to demonstrate retaliatory intent, and Dudley has produced no other evidence giving rise to an inference of retaliatory animus. See Spadola, 242 F. Supp. 2d at 294-95. Moreover, in his request to the HR department, Gelbfish discusses in detail his meetings with Dudley between March and June 2010 concerning Dudley's tardiness, and Dudley's continued late arrivals, despite repeated instructions and warnings that he should arrive on time. (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 18) Accordingly, Defendants have provided a legitimate explanation for Dudley's removal from the Flex Time program. Dudley has not offered any evidence that these explanations were pretextual; instead he merely claims in conclusory terms that the explanations were "pretextual" and "false." (See Pltf. Br. (Dkt. No. 31) at 25)

As to NYCHA's refusal to reinstate Dudley to the Flex Time program in September 2011, this determination is likewise part of the process begun in June 2010 to address Dudley's history of tardiness and poor attendance. Moreover, this event is too far removed in

time from both the November 2010 EEOC complaint and the March 2011 complaint to Marano to establish a causal connection.[12]

### 4. Dudley's November 2011 Email to Marano

Dudley also claims that he was retaliated against for complaining to Marano in a November 28, 2011 email that Gelbfish was discriminating against him.  (Pltf. Br. (Dkt. No. 31) at 25)  Dudley has offered no evidence of a causal connection between this email and any adverse action, however.  Indeed, in response to Dudley's November 28, 2011 email – and Dudley's December 22, 2011 email – Dudley's supervisors granted his request for a transfer to another department.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶¶ 83, 85)  There is no evidence that this transfer resulted in any change in Dudley's job title or in the nature of his responsibilities.  (See Nov. 4, 2013 Niederhoffer Decl. (Dkt. No. 23), Ex. 5 (Marano Dep. Tr.) at 32)

To the extent Dudley claims he was retaliated against when he received four counseling memoranda between April 9, 2012 and June 4, 2012 (see Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 86), these memoranda are too far removed in time from the November and December emails to provide an inference of retaliatory intent.

---

[12]  Dudley claims that his December 7, 2010 encounter with Gelbfish – during which Gelbfish approached Dudley at his cubicle, and then followed him to the elevator – was motivated by racial animus.  (See Dudley Aff. (Dkt. No. 33), Ex. A (June 13, 2013 Dudley Dep. Tr.) at 34-35) He does not appear to allege that Gelbfish approached him in this fashion in retaliation for filing the EEOC Complaint.  (See id.)

Even if Dudley were to raise such a claim, it would fail.  No reasonable person would be dissuaded from filing a discrimination complaint because – when they refused to speak to their employer about a work matter and abruptly walked away – their employer followed them to another area of the building in an attempt to continue the conversation.  Gelbfish's actions during this incident do not constitute retaliatory acts under Title VII, the NYSHRL, or the NYCHRL.

5.    **"Pretextual" Disciplinary Actions as Evidence of a Causal Connection**

Dudley's argument that the "pretextual nature of the actions taken against [him]" (Pltf. Br. (Dkt. No. 31) at 25) demonstrates a causal connection between alleged retaliatory actions and his protected activities fails also, essentially for the same reasons that this argument fails in the context of his discrimination claims. The mere fact that Dudley began receiving poor performance reviews under a new supervisor does not demonstrate that these negative reviews were the result of retaliation for Dudley's involvement in a protected activity. Moreover, even if Dudley could show that the allegations in the counseling memoranda and during the disciplinary hearings are false, no reasonable juror could conclude from the record before this Court that these actions were taken in retaliation for Dudley's involvement in any protected activity.

*       *       *       *

Defendants' motion for summary judgment on Dudley's retaliation claims will be granted.

IV.   **DISABILITY DISCRIMINATION CLAIMS**

Dudley also asserts claims under the ADA, the NYSHRL, and the NYCHRL for disability discrimination. According to Dudley, "[his] claim . . . is not that there was an underlying animus toward him due to his disability, but rather, that he was denied reasonable accommodations for his known disability." (Pltf. Br. (Dkt. No. 31) at 19) Dudley alleges that "immediately after [he] had knee surgery, and as such, was rendered with limited mobility, Gelbfish and Orlowski took th[e] opportunity to remove Plaintiff from flex time, which would have helped accommodate his need for extra time to get into the office, and rather[ ] required him to come into the office on a set schedule[ ] earlier in the day." (Id. at 20)

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); see also Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (same). "ADA employment discrimination claims are subject to the familiar burden-shifting analysis established by the Supreme Court in McDonnell Douglas." Sista, 445 F.3d at 169. "A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." Id.

Discrimination in violation of the ADA includes, inter alia, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008). For the purposes of the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To make out a prima facie case of disability discrimination arising out of a failure to accommodate, plaintiff must demonstrate that

> (1) plaintiff is a person with a disability under the meaning of the ADA;
>
> (2) an employer covered by the statute had notice of his disability;
>
> (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and
>
> (4) the employer has refused to make such accommodations.

Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir. 2006) (quoting Rodal v.

Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 118 (2d Cir. 2004)) (internal quotation marks

omitted).

       "Failure to provide a reasonable accommodation to an employee's known

disability is a form of discrimination under both the NYSHRL and the NYCHRL [as well]."

Miloscia v. B.R. Guest Holdings LLC, 33 Misc. 3d 466, 473 (N.Y. Cnty. Sup. Ct. 2011), aff'd in

part, modified in part, 94 A.D.3d 563 (1st Dep't 2012); see also Vinokur v. Sovereign Bank, 701

F. Supp. 2d 276, 293 (E.D.N.Y. 2010).

       Under the ADA, an individual is disabled if he possesses "a physical or mental

impairment that substantially limits one or more major life activities of such individual." 42

U.S.C.A. § 12102(1)(A).  "The New York State Executive Law and the New York City

Administrative Code have a broader definition of 'disability' than does the ADA; neither statute

requires any showing that the disability substantially limits a major life activity."  Reilly v.

Revlon, Inc., 620 F. Supp. 2d 524, 541 (S.D.N.Y. 2009).  Under the NYSHRL,

> the term "disability" is not limited to physical or mental impairments but "may
> also include 'medical' impairments.  In addition, to qualify as a disability, the
> condition may manifest itself in one of two ways:  (1) by preventing the exercise
> of a normal bodily function or (2) by being demonstrable by medically accepted
> clinical or laboratory diagnostic techniques."  Thus, under state law, a disability
> need only be a demonstrable impairment. . . .

Casseus v. Verizon N.Y., Inc., 722 F. Supp. 2d 326, 350 (E.D.N.Y. 2010) (quoting State Div. of

Human Rights on Complaint of McDermott v. Xerox Corp., 65 N.Y.2d 213, 219 (1985)).

"Unlike [the] NYSHRL, [the] NYCHRL defines 'disability' solely in terms of impairments:

'any physical, medical, mental or psychological impairment, or a history or record of such

impairment'" . . . which includes 'an impairment of any system of the body.'"  Krause v. Lancer

& Loader Grp., LLC, 40 Misc. 3d 385, 396 (N.Y. Cnty. Sup. Ct. 2013) (quoting N.Y.C. Admin. Code § 8-102(16)).

   Dudley's disability-related claims are meritless on their face, for a number of reasons. First, Dudley has not demonstrated that he is disabled. His claims relate only to a temporary injury while he was recovering after surgery for a torn meniscus. "Courts within this [C]ircuit, and the vast majority of courts elsewhere which have considered the question, have held that temporary disabilities do not trigger the protections of the ADA because individuals with temporary injuries are not disabled persons within the meaning of the act." Graaf v. N. Shore Univ. Hosp., 1 F. Supp. 2d 318, 321 (S.D.N.Y. 1998). "[E]ven accepting the plaintiff's version of the facts, [he] cannot show that [he] had more than a temporary [injury] after [his] surgery. Plaintiff's injury did not have the long term impact to qualify as a disability under the terms of the ADA." Rector v. Sylvania, 285 F. Supp. 2d 349, 355 (S.D.N.Y. 2003). "In addition to the fact that the plaintiff's injury was temporary in nature, [he] has not identified a major life activity that has been substantially impaired by [his] injury." Id. Indeed, Dudley has demonstrated no impairment whatsoever in his major life activities; his only claim is that it took him longer to get to work because he had to walk with a cane. See Stamm v. N.Y.C. Transit Auth., No. 04-CV-2163 (SLT) (JMA), 2011 WL 1315935, at *16-17 (E.D.N.Y. Mar. 30, 2011) ("[N]either travel nor commuting are, themselves, major life activities.") (citing cases).

   Accordingly, Dudley is not disabled within the meaning of the ADA. Given the limited nature of his injury – and the absence of any evidence that this injury impaired him, other than slowing him down while he was required to walk with a cane – it is doubtful that Dudley's injury qualifies as a disability even under the broader definitions of the NYSHRL and NYCHRL.

In any event, Dudley's disability claims fail for the additional reason that he has offered no evidence that he was unable to perform, or impaired in performing, his job due to his knee surgery, such that his employer would be required to provide him with a "reasonable accommodation" to enable him to satisfy his job responsibilities or enjoy related rights of employment.[13]   See Miloscia v. B.R. Guest Holdings LLC, 33 Misc. 3d 466, 478 (N.Y. Cnty. Sup. Ct. 2011), aff'd in part, modified in part, 94 A.D.3d 563 (1st Dep't 2012) ("'Implicit in the [NYCHRL and NYSHRL] is the requirement that the accommodation enable the employee to continue to enjoy or perform the terms, conditions or privileges of employment.'" (quoting Ruhling v. Tribune Co., No. CV 04-2430 (ARL), 2007 WL 28283, at *15 n.4 (E.D.N.Y. Jan. 3, 2007))); N.Y.C. Admin. Code § 8-107(15)(a) ("[A]ny person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to satisfy the essential requisites of a job or enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity.") (emphasis added); cf. McNamara v. Tourneau, Inc., 496 F. Supp. 2d 366, 376 (S.D.N.Y. 2007), aff'd, 326 F. App'x 68 (2d Cir. 2009) ("Where a reasonable accommodation is needed, it is the employee's responsibility to request the accommodation and to inform the employer that an accommodation is needed.") (emphasis added).

Moreover, Dudley's alleged disability did not prevent him from arriving at work on time.  Simply leaving for work earlier would have allowed him to meet his start time each day.  His supervisors – who, as discussed above, had legitimate reasons for requiring Dudley to

---

[13]  It is undisputed that Orlowski told Dudley to report to work at 8:15 a.m. beginning on February 19, 2010, and that Dudley did not have knee surgery until March 4, 2010.  (Pltf. R. 56.1 Stmt. (Dkt. No. 34) ¶ 29)  Accordingly, contrary to Dudley's argument that Gelbfish and Orlowski "[took] the opportunity" to impose an earlier start time after Dudley had surgery, the earlier start time was already in place before Dudley underwent surgery.

start earlier, due to his work on the Qmatic project – were not required to permit him to work later hours simply because that would have been more convenient for Dudley. Dudley's desire to begin working an hour and a half later amounts to nothing more than a preference, which is not actionable under the disability discrimination statutes, even assuming that Dudley suffers from a disability. See Raffaele v. City of New York, Civ. A. No. 00CV3837 (DGT) (RLM), 2004 WL 1969869, at *16 (E.D.N.Y. Sept. 7, 2004) ("The ADA does not obligate the employer to meet the personal preferences of disabled employees. . . . Accommodations need only be 'sufficient to meet the job-related needs of the individual being accommodated.' Difficulties commuting to a job need not be accommodated.") (citation omitted) (citing cases); see also Felix v. N.Y.C. Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003) ("The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled; it does not authorize a preference for disabled people generally."); Lyons v. Legal Aid Soc., 68 F.3d 1512, 1516 (2d Cir. 1995) ("[T]he [ADA's] accommodation obligation does not require the employer to make accommodations that are 'primarily for the [individual's] personal benefit,' such as an 'adjustment or modification [that] assists the individual throughout his or her daily activities, on and off the job,' or to provide 'any amenity or convenience that is not job-related.'" (quoting 29 C.F.R. Pt. 1630, App'x at § 1630.9 ("Interpretative Guidance on Title I of the Americans with Disabilities Act"))).

For the reasons stated above, Defendants' motion for summary judgment on Dudley's disability discrimination claims will be granted.

## V.    SECTION 1983 CLAIMS

Dudley claims that Defendants violated his right to equal protection under the Fourteenth Amendment and the New York Constitution, by discriminating against him on the

basis of race and denying him reasonable accommodations for his "disability."[14]  (Cmplt. (Dkt. No. 1) ¶ 39; Pltf. Br. (Dkt. No. 31) at 19-20)

       For the reasons stated above, the record does not demonstrate that Defendants discriminated against Dudley on the basis of race.  That finding is fatal to Dudley's race-based Section 1983 claims.  See Reynolds v. Barrett, 685 F.3d 193, 201 (2d Cir. 2012) ("It is well established that "'[p]roof of racially discriminatory intent or purpose is required" to show a violation of the Equal Protection Clause.'  Therefore, 'a plaintiff pursuing a claimed . . . denial of equal protection under § 1983 must show that the discrimination was intentional.'" (quoting City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found., 538 U.S. 188, 194 (2003); Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004))).

       As to Dudley's claim that he was denied reasonable accommodations for his alleged disability, "[f]ailure to provide a reasonable accommodation cannot form the basis of an Equal Protection claim."  O'Leary v. Town of Huntington, No. 11-CV-3754 (JFB) (GRB), 2012 WL 3842567, at *14 (E.D.N.Y. Sept. 5, 2012); see also Negron v. City of New York, No. 10 CV 2757 (RRM) (LB), 2011 WL 4737068, at *16 (E.D.N.Y. Sept. 14, 2011), report and recommendation adopted, No. 10-CV-2757 (RRM) (LB), 2011 WL 4729754 (E.D.N.Y. Oct. 6, 2011) ("[T]o the extent that plaintiff alleges that defendants discriminated against her on the basis of her disability by not providing her with a workplace accommodation for her injured left hand, plaintiff's claim fails because the Equal Protection Clause does not require accommodations for the disabled.").  "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions toward such individuals

---

[14] "[T]he Second Circuit has held that 'the Equal Protection Clauses of the federal and New York Constitutions are coextensive.'"  Weber v. City of New York, 973 F. Supp. 2d 227, 274 (E.D.N.Y. 2013) (quoting Town of Southold v. Town of E. Hampton, 477 F.3d 38, 52 n.3 (2d Cir. 2007)).

are rational. . . . . If special accommodations for the disabled are to be required, they have to

come from positive law and not through the Equal Protection Clause."  <u>Bd. of Trustees of Univ.</u>

<u>of Alabama v. Garrett</u>, 531 U.S. 356, 367-68 (2001).  Moreover, as stated above, the record does

not support Dudley's contention that he was disabled, or that he was denied a reasonable

accommodation that he was entitled to by virtue of his injured knee.

   Accordingly, Defendants' motion for summary judgment on Dudley's Section

1983 claims will be granted.

## VI. <u>AIDER AND ABETTOR CLAIMS</u>

   Dudley claims that the individual Defendants are liable as aiders and abettors of

the race and disability discrimination underlying his NYSHRL and NYCHRL claims.  (Cmplt.

(Dkt. No. 1) ¶ 48)  "[B]ecause plaintiff has failed to raise a triable issue of material fact that [he]

was either retaliated against or discriminated against because of [his] race [or disability], [his]

[NYSHRL and NYCHRL] claims that defendants aided and abetted each other in any

discrimination or retaliation cannot survive."  <u>Forrest v. Jewish Guild for the Blind</u>, 3 N.Y.3d

295, 314 (2004).  Accordingly, Defendants will be granted summary judgment as to Dudley's

aider and abettor claims under the NYSHRL and NYCHRL.

## **CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is granted.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 22), and to close this case.

Dated: New York, New York
          September 30, 2014

                                        SO ORDERED.

                                        _____
                                        Paul G. Gardephe
                                        United States District Judge